IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Civil Action No. 1:05-CV-081

| | |
|---|---|
| RONALD BLANCHARD ) | REPLY BRIEF IN SUPPORT OF |
| ) | DEFENDANT'S MOTION TO |
| Plaintiff, ) | DISMISS OR STAY TO ALLOW |
| ) | FOR ARBITRATION UNDER THE |
| vs. ) | FEDERAL ARBITRATION ACT |
| ) | |
| MBNA AMERICA BANK, N.A. ) | |
| ) | |
| Defendant. ) | |

Defendant MBNA America Bank, N.A. ("MBNA") submits this reply brief in support of its motion to dismiss or stay further proceedings to permit arbitration of the lawsuit filed by Plaintiff Ronald Blanchard ("Mr. Blanchard").

## Undisputed Facts

The following facts remain undisputed even after Mr. Blanchard's response:

1. Three MBNA accounts bearing Mr. Blanchard's name were opened in 1984, 1987 and 1994 ("Accounts"). Fisher Affid., ¶ 4.

2. For at least ten years, statements on the Accounts, amendments to the Accounts, and Account-related correspondence were mailed to Mr. Blanchard's office address at P.O. Box 868, Hendersonville, North Carolina 28793. Fisher Affid., ¶¶ 5-18 & Exh. E thereto.

3. Mr. Blanchard admits that P.O. Box 868, Hendersonville, North Carolina 28793 is his mailing address. Blanchard Affid., ¶¶ 21-22.

4. The agreements governing the three Accounts were amended in writing in 1999 to include an arbitration clause. Charges were made to the

#797781_2.DOC

three Accounts after January 25, 2000 without any "opt out" of the amendment. The amendment was mailed to Mr. Blanchard's post office box in Hendersonville and was not returned. Fisher Affid., ¶¶ 9-17 & Exhs. C & D thereto.

5. Since the first account was opened in 1984, the Accounts were used for Mr. Blanchard's personal benefit. Among other things, the Accounts were used to pay the following expenses:

    a.    air travel for Mr. Blanchard;

    b.    Mr. Blanchard's country club dues;

    c.    continuing legal education expenses for Mr. Blanchard;

    d.    bar dues for Mr. Blanchard;

    e.    the Martindale Hubbell listing for Mr. Blanchard's law firm;

    f.    telephone bills for Mr. Blanchard's law firm;

    g.    Mr. Blanchard's personal life insurance premiums;

    h.    county taxes for Mr. Blanchard's law firm;

    i.    individual North Carolina taxes for Mr. Blanchard.

Fisher Affid., ¶¶ 12, 16 & Exhs. E – G thereto. In addition, the Accounts were used to transfer funds to Mr. Blanchard individually, and at least one Account was used to make a payment to Cathleen Blanchard. *Id.*

6. Since at least February 2002 the Accounts were paid using checks debited to Mr. Blanchard's law firm bank account. Fisher Affid., ¶ 17 & Exhs. H – J thereto.

7. Mr. Blanchard has admitted cloaking his secretary, Kathy McDonald, with authority to handle his mail and personal and law firm finances:

    a. "she opened all mail that came into my law office";

    b. "she made deposits into the bank accounts for the firm'";

    c. "she paid the firm's bills";

    d. "she made deposits into my personal bank accounts and she paid my personal bills";

    e. she "was responsible for family bank accounts, containing checks for signature by [Mr.] Blanchard";

    f. she "balanc[ed] the bank statements";

    g. she was responsible for "other clerical duties";

    h. Mr. Blanchard "had the right to direct control of her while performing services for him."

Blanchard Affid., ¶ 19; Moss Affid., ¶ 6 and Exh. A.

## Reply Argument

By turning over all his financial affairs to Ms. McDonald, and then ignoring many years of evidence which would have revealed her use of the Accounts, Mr. Blanchard believes that he has absolved himself from the consequences of her actions and from his negligent oversight. This position fails as a matter of law, as more fully demonstrated below.

**A. Use of the Accounts after January 25, 2000 constitutes acceptance of the agreement to arbitrate.**

Use of the Accounts by Mr. Blanchard or his agent, Kathy McDonald, constitutes an agreement by Mr. Blanchard to arbitrate any disputes relating to

#797781_2.DOC

3

the Accounts. The agreements governing the Accounts provide that "[w]hen you accept or use the account, you agree to the terms of this Agreement." Fisher Affid., ¶ 6 & Exh. A. It is undisputed that the Accounts were used for Mr. Blanchard's personal and professional benefit. The only remaining question is whether Kathy McDonald, Mr. Blanchard's secretary, had actual authority or apparent authority to use the Accounts after January 25, 2000, the date the arbitration amendments sent by MBNA became effective. Fisher Affid., ¶ 6 & Exh. A. Mr. Blanchard's actions and omissions confirm Kathy McDonald's actual authority or apparent authority.

**B.  Kathy McDonald had actual authority or apparent authority to use the Accounts after the amendment became effective.**

The Accounts were opened and used as early as 1984, and since at least 1994 all three Accounts were used to pay the professional and personal expenses of Mr. Blanchard. Mr. Blanchard claims he first learned about the Accounts in November 2003, but this assertion can be true only if Kathy McDonald had unfettered authority over Mr. Blanchard's mail and personal and professional finances. Had Mr. Blanchard opened his firm post office box, or reviewed his personal bank statements, the alleged fraud would have unraveled many years earlier. This is because the MBNA Accounts funded Mr. Blanchard's law firm operations and paid Mr. Blanchard's personal bills, and Mr. Blanchard's own checking account was used to pay down the MBNA Accounts. Mr. Blanchard concedes that Kathy McDonald had complete authority over his finances. Accordingly, Kathy McDonald was Mr. Blanchard's agent with respect to his personal and professional finances.

#797781_2.DOC

4

### 1. Mr. Blanchard had the "right to control" his secretary's work.

An agency relationship exists if Mr. Blanchard had the "right to control" Kathy McDonald's work, and if Kathy McDonald had the "authority" to act for Mr. Blanchard in the area of his finances. *See Vaughn v. N.C. Dep't of Human Resources*, 37 N.C. App. 86, 91, 245 S.E.2d 892, 895 (1978), *aff'd*, 296 N.C. 683, 252 S.E.2d 792 (1979). "The critical element of an agency relationship is the right of control . . ." *Wyatt v. Walt Disney World, Co.*, 151 N.C. App. 158, 166, 565 S.E.2d 705, 710 (2002).

In this case, Mr. Blanchard has admitted the element of control. Mr. Blanchard admitted that he "had the right to direct control of her [Kathy McDonald] while performing services for him." Moss Affid., ¶6 and Exh. A. Also, North Carolina courts recognize that "the 'right to fire' is one of the most effective methods of control." *Cooper v. Publishing Co.*, 258 N.C. 578, 589, 129 S.E.2d 107, 115 (1963). Mr. Blanchard promptly fired Kathy McDonald after learning of her alleged fraud. Blanchard Affid., ¶ 24. Consistent with Mr. Blanchard's admissions, North Carolina courts have acknowledged that a principal-agency relationship exists between a secretary and her employer. *See, e.g., Wilson v. Claude J. Welch Builders*, 115 N.C. App. 384, 387-88, 444 S.E. 2d 628, 629-30 (1994). Accordingly, Mr. Blanchard has conceded the "control" element.

## 2. Mr. Blanchard's secretary had "actual authority" or "apparent authority" to handle his finances, including handling matters relating to the MBNA Accounts.

The undisputed facts also prove the authority of Mr. Blanchard's secretary to use the Accounts. Mr. Blanchard made Kathy McDonald "responsible for family bank accounts, containing checks for signature by Blanchard, opening bank statements, balancing the bank statements, in addition to other clerical duties." Moss Affid., ¶ 6 and Exh. A. This authority extended to opening Mr. Blanchard's mail and paying his personal and law firm bills. *See* Blanchard Affid., ¶ 19. These undisputed facts cloak Kathy McDonald with either actual authority or apparent authority regarding the MBNA Accounts. Either is sufficient for this matter to be sent to arbitration.

### a) Kathy McDonald had actual authority or apparent authority to receive and handle Mr. Blanchard's mail.

Kathy McDonald had actual authority or apparent authority to handle Mr. Blanchard's mail, and since notice to an agent is notice to the principal, Mr. Blanchard is deemed to have received the arbitration amendment sent by MBNA. *See Passmore v. Woodard*, 37 N.C. App. 535, 541, 246 S.E.2d 795, 800 (1975) ("Notice to and knowledge of an authorized agent is imputed to the principal even though the agent does not inform the principal thereof.").

Mr. Blanchard claims he did not *personally* receive any correspondence from MBNA, but he admits that Kathy McDonald was responsible for opening all the mail that arrived at his law office post office box. Blanchard Affid., ¶ 19. There is no evidence that Kathy McDonald did not receive the arbitration

amendment for the Accounts. Accordingly, no evidence rebuts the inference that Mr. Blanchard received this correspondence through his agent.

Similar facts were presented in *Wilson v. Claude J. Welch Builders*, 115 N.C. App. 384, 386-87, 444 S.E. 2d 628, 629-30 (1994). In that case, an insurer mailed a policy cancellation notice to the principal, but the principal claimed he did not receive it. There was,

> [H]owever, no evidence that [the principal's] agent, his secretary whose duties included handling the mail, did not receive the letter. Thus, because there is no evidence that [the principal's] secretary did not receive the letter, the inference created by the establishment of the prima facie case – that the letter was received by [the principal] – is not rebutted.

*Wilson*, 115 N.C. App. at 386-87, 444 S.E.2d at 629-30. Therefore, Mr. Blanchard is deemed to have received the MBNA arbitration amendment for the Accounts.

### b) **Kathy McDonald had actual authority to handle Mr. Blanchard's finances, including paying Mr. Blanchard's personal and professional bills.**

Kathy McDonald's authority extended to the handling of Mr. Blanchard's professional and personal finances. Mr. Blanchard argues that he did not specifically authorize Kathy McDonald to open the three MBNA Accounts, but Mr. Blanchard "is liable for the acts of [his] agent acting within the range of the agent's employment, even if not expressly authorized by [Mr. Blanchard]." *Northwestern Bank v. Roseman*, 81 N.C. App. 228, 235, 344 S.E.2d 120, 125-26 (1986). Kathy McDonald was Mr. Blanchard's actual agent with respect to his finances; therefore, Mr. Blanchard is responsible for Kathy McDonald's

handling of the MBNA Accounts, even if he did not know about or specifically authorize this handling:

> The general rule is that a principal is responsible to third parties for injuries resulting from the fraud of his agent committed during the existence of the agency and within the scope of the agent's actual or apparent authority from the principal, even though the principal did not know or authorize the commission of the fraudulent acts.

*Norburn v. Mackie*, 262 N.C. 16, 23, 136 S.E.2d 279, 284-85 (1964).

For example, the North Carolina Supreme Court held an employer liable for its salesman's fraud, when the salesman filled out invoices for the benefit of his employer but then forged customer signatures onto false invoices and submitted them for payment, converting, without the employer's knowledge, nearly $16,000 of customer money for the salesman's personal use.

The high Court found the employer liable for the employee's fraud because the fraud occurred while the employee was acting within his authority. The evidence was "amply sufficient to support the court's findings that [the employee] was 'an employee, agent, and servant of the defendant corporation . . . acting in the course and scope of his employment[.]'" *Thrower v. Coble Dairy Prods. Coop., Inc.*, 29 N.C. 109, 111, 105 S.E.2d 428, 430 (1958). *See also White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 603 S.E.2d 147, 157 (2004) (holding that an employee's embezzlement, where it occurred during the precise tasks he was hired to do, was within that employee's scope of employment), *review denied*, 2005 N.C. LEXIS 45 (Feb. 3, 2005).

In this case, Kathy McDonald's actions with respect to the MBNA Accounts occurred in the context of her authority to handle Mr. Blanchard's personal and professional finances. Indeed, the charges made on the Accounts personally benefited Mr. Blanchard. Therefore, Mr. Blanchard is responsible for the actions taken by Kathy McDonald with respect to the MBNA Accounts, even if Mr. Blanchard did not formally authorize the opening of the Accounts, and arbitration is needed to determine the scope of Mr. Blanchard's responsibility. *See, e.g., Northwestern Bank v. Roseman*, 81 N.C. App. 228, 235-36, 344 S.E.2d 120, 125-26 (1986) (bank is responsible if its employee fraudulently obtained a customer's signature while procuring a factoring agreement for the bank, when the employee had authority to procure the factoring agreement).

### b) **Kathy McDonald had apparent authority because of Mr. Blanchard's negligence in failing to check his bank statements or his post office box.**

Alternatively, Kathy McDonald had apparent authority to carry out tasks related to the MBNA Accounts. In *Minskoff v. American Express Travel Related Servs. Co.*, 98 F.3d 703 (2d Cir. 1996), the Second Circuit affirmed the grant of summary judgment in favor of American Express when a cardholder attempted to avoid amounts due on accounts bearing his name because of his employee's fraud. The employee, Susan Blumenfeld, worked for the president of a corporation. The president was issued a corporate American Express account. Ms. Blumenfeld, who was in charge of the president's mail, completed an application for an additional card that was issued on the same

#797781_2.DOC

9

corporate account. This occurred without the knowledge or acquiescence of the president or the corporation.

From April 1992 until March 1993, Ms. Blumenfeld charged almost $30,000 on that card. During this time, American Express sent twelve billing statements to the business address of the corporation, and American Express received twelve checks drawn on accounts maintained by the corporation or its president for payment of the cards. The president did not review any of the statements or the cancelled checks received during this twelve-month period.

Later, American Express sent a separate solicitation to the president's address, and Ms. Blumenfeld opened a second credit card account in his name, giving him one credit card and secretly requesting and obtaining a supplemental card for herself. Over the next sixteen months, Ms. Blumenfeld made charges to the second credit card. American Express mailed monthly billing statements to the corporate address, and these bills were paid with checks drawn on corporate accounts and made payable to American Express. *Minskoff*, 98 F.3d at 706-707. Later it was discovered that Ms. Blumenfeld had forged numerous checks, including at least twenty payments to American Express for charges made on the two American Express cards.

The corporation and its president claimed that they could not be liable for Ms. Blumenfeld's theft because it occurred without authority. However, the Second Circuit disagreed, found apparent authority based on conduct, and determined that the employer was placed on notice when it received the first American Express statement containing the fraudulent charges. "After that

time, [plaintiffs-appellants] are liable for the remaining fraudulent charges." *Minskoff*, 98 F.3d at 710 (brackets in the original).

The reason for this responsibility was apparent authority. According to the Second Circuit a cardholder may not "disregard both credit card and bank statements indefinitely, or even fail to act upon a discovery that an employee had fraudulently obtained and was fraudulently using a credit card, and still limit his liability . . ." *Minskoff*, 98 F.3d at 709. Rather, "[a] cardholder's failure to examine credit card statements that would reveal fraudulent use of the card constitutes a negligent omission that creates apparent authority for charges that would be considered unauthorized . . ." *Minskoff*, 98 F.3d at 709-710.

The facts at bar are more egregious than the facts considered by the Second Circuit. In this case, for at least ten years (and as long as twenty years) MBNA mailed regular statements to Mr. Blanchard regarding the three Accounts. Mr. Blanchard appears to have ignored them. During this time Mr. Blanchard and his wife received personal funds from the MBNA Accounts, and regular payments were made on the Accounts using Mr. Blanchard's own checking account. Again, neither Mr. Blanchard nor any employee of his law firm (other than Kathy McDonald) became aware of the Accounts or the payments on the Accounts until more than a decade after the latest Account was opened. Even a cursory review of the MBNA statements, or cancelled checks sent to Mr. Blanchard on his bank accounts, would have disclosed what Mr. Blanchard now contends is a fraud. "These omissions on the part of plaintiffs-appellants created apparent authority for [Kathy McDonald's]

continued use of the cards, especially because it enabled [Kathy McDonald] to pay all of the [MBNA] statements with forged checks, thereby fortifying [MBNA's] continuing impression that nothing was amiss with the [Accounts]." *Minskoff*, 98 F. 3d at 709-710.

The *Minskoff* Court, applying common law agency principals, concluded that "once a cardholder receives a statement that reasonably puts him on notice that one or more fraudulent charges have been made, he cannot thereafter claim lack of knowledge. The district court was justified in concluding that no reasonable jury could conclude that this standard has been satisfied as to plaintiffs-appellants on the record presented in this case, warranting summary judgment in favor of American Express as to the extent we have previously indicated." *Minskoff*, 98 F.3d at 710.

In the same way, no reasonable jury can conclude that Mr. Blanchard acted reasonably by allowing twenty years to pass before detecting the use of the MBNA Accounts by his secretary, and her payment for those charges using Mr. Blanchard's own checking account.

### **Conclusion**

Mr. Blanchard is in a superior position, when compared with MBNA, to examine the MBNA Account statements, his personal and law firm bank statements, and to check his mailbox to see what mail resides there. As in *Minskoff*, Mr. Blanchard is not allowed, as a matter of law, to remain ignorant regarding the existence of the MBNA Accounts, or that his own bank accounts were used to pay for them. The three MBNA Accounts were each at least five

years old before MBNA notified Mr. Blanchard, through is actual agent, of the arbitration amendment. Therefore, Mr. Blanchard's claims against MBNA are arbitrable, and MBNA requests that the Court grant its motion to dismiss to permit arbitration.

This the 9th day of June, 2005.

SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, L.L.P.

By: /s/ Michael E. Weddington

Michael E. Weddington
N. C. State Bar No. 5885
Jackson Wyatt Moore, Jr.
N. C. State Bar No. 29912
2500 Wachovia Capitol Center
P. O. Box 2611
Raleigh, North Carolina 27602-2611
(919) 821-1220
(919) 821-6800 (fax)

Attorneys for Defendant

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this date served the foregoing document in the above-entitled action upon all other parties to this cause by depositing a copy thereof, postage paid in the United States mail, addressed to the attorney or attorneys for said parties as follows:

> Boyd B. Massagee, Jr.
> Prince, Youngblood & Massagee
> 240 Third Avenue West
> Hendersonville, NC 28739

This the 9th day of June, 2005.

_____
Michael E. Weddington